UNITED STATES of America,
Plaintiff-Appellant,

v.

John Clifton PICHANY,
Defendant-Appellee.

No. 81–2841.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1982.
Decided Aug. 23, 1982.

Douglas B. Altman, Asst. U. S. Atty., Hammond, Ind., for plaintiff-appellant.

David Paul Allen, Hammond, Ind., for defendant-appellee.

Before BAUER, WOOD and CUDAHY, Circuit Judges.

PER CURIAM.

The United States appeals, pursuant to 18 U.S.C. § 3731,[1] from the district court's decision to suppress evidence obtained during the warrantless search of the defendant's warehouse. The exclusive issue raised in this appeal is whether the "community caretaking" exception to the Fourth Amendment warrant requirement first established in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973), and previously applied only to automobiles extends to the search of an un-

locked warehouse during a burglary investigation.

At approximately 7:00 a. m. on August 6, 1981, Lonnie Hunter, the owner of Hunter Trailer Manufacturing Co., called the Sheriff's Department in La Porte County, Indiana to report a burglary at his business. Officer Steve Pearce answered the call and agreed to meet Hunter at the premises within an hour. Pearce testified at the suppression hearing that it was clear from the call that the burglary was not in progress. Hunter, who told Pearce the break-in had occurred overnight, apparently had already inspected the premises and assembled a partial inventory of stolen items.

After waiting twenty minutes to allow Hunter time to travel to the warehouse, Pearce left for the warehouse with Sergeant Robert Peters, an officer in the same department familiar with the Kingsbury Industrial Park and the location of Hunter's business in that setting. The officers intended to interview Hunter, inspect the scene, and complete a standard department burglary report. Pearce had told Hunter to finish listing the items stolen to facilitate the investigation. There being no emergency the officers drove to the industrial park at average speed and arrived ten minutes later.

The Kingsbury Industrial Park is a former Army munitions depot. It contains approximately sixty large aluminum buildings of nearly equal size and appearance, some of which are leased by the present owner to private businesses. The buildings are set in nine rows and labelled with military numbers. No business signs or postal addresses designate the occupants of the separate buildings. The industrial park has a deserted, desolate atmosphere and had been the site of previous break-ins. Hunter leased two buildings in the park, numbered S–8–4 and S–9–4. The defendant leased

[1]. In pertinent part, 18 U.S.C. § 3731 provides:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court's suppressing or excluding evidence ... in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

one, S–8–3, located in the same row as Hunter's buildings. The defendant acknowledges that, except for their military numbering and different style doorways, the three buildings appeared virtually identical.

Arriving at the park, the officers went directly to Hunter's S–9–4 building. The policemen were thirty minutes early for the scheduled meeting with Hunter, who was not present and did not respond when they called his name. No car was parked in the vicinity. The officers looked through a large ventilator on the side of the S–9–4 building and saw welding equipment, finished and partially finished lightweight trailers, and other materials Hunter used for manufacturing trailers. The officers went to the adjacent S–8–4 building where, peering through a small hole in the side of the building, they saw similar materials indicating that Hunter also leased this building. Since Hunter still did not respond to their calls, the officers continued looking around and proceeded to the S–8–3 building, which the defendant, John Pichany, leased.

Though the defendant had rented the warehouse under the business name Newman Enterprises, no sign on the warehouse indicated his occupancy. Like the other buildings in the industrial park, only the old military numbering identified it. Unlike the Hunter buildings, neither the service door nor the sliding doors on the side of the building were locked. The officers knocked loudly and once again called for Hunter. There was no answer. They entered the building. Inside they saw a semi-tractor and trailer. Because the truck was amateurishly painted, the officers became suspicious and investigated closer. They recorded the license number of the truck. Officer Pearce also became curious about a large

canvas tarpaulin, which hanging from the warehouse ceiling to the floor, secluded the northeast corner of the building from view. Pearce walked toward the curtain, believing, he testified at the suppression hearing, that it might be Hunter's office. As he approached, a tractor wheel was visible in the crevice between the tarpaulin and the wall. Pearce pulled the curtain aside and found two new John Deere farm tractors.

After recording the serial numbers from the tractors, the officers left the building. They did not search further for Hunter. They returned to the sheriff's department where, consulting police records they found that the semi-tractor and the farm tractors were stolen, but were unrelated to the Hunter burglary which the officers were investigating. Obtaining a search warrant, the officers returned and seized the vehicles. The officers did not locate Hunter that day; he appeared the following day at the department headquarters and completed the burglary report.

A grand jury indicted the defendant under 18 U.S.C. § 659 [2] for the theft of four John Deere tractors from an interstate shipment. The defendant moved to suppress the evidence found in the warehouse, arguing the officers' initial entry into his leased building violated the Fourth Amendment. Ten days later the district court granted the motion. The United States then filed a notice of appeal.

The government raises a single argument to justify the warrantless entry into the warehouse. The government argues that the rationale which the Supreme Court accepted in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), to allow the warrantless search of an impounded automobile extends to the warrantless entry into an unlocked warehouse.

2. In pertinent part, 18 U.S.C. § 659 provides: Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, air-

craft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate ... shipment of freight, express, or other property; ...

[s]hall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; ....

In *Cady*, the police in Kewaskum, Wisconsin towed an automobile, disabled in an accident and hazardous to other vehicles on the road, to a local garage. The owner, an off-duty Chicago policeman, was too intoxicated to make those arrangements himself. Believing that Chicago Police Department regulations required officers to carry revolvers at all times, the police searched the car at the gas station to find the gun. Because they were not investigating any crime, the police did not obtain a search warrant. During the search the police discovered several bloody garments, which belonged to a recent homicide victim and were integral in the defendant's eventual conviction for first degree murder. The defendant appealed the conviction, arguing the automobile search violated the Fourth Amendment. The Supreme Court rejected the argument, holding that the search, undertaken under the police "community caretaking function," was reasonable.

The government here argues that because the officers were not investigating the defendant's involvement in any crime and entered the S–8–3 warehouse only to search for Hunter and investigate a burglary at his business, they too were acting in a "community caretaking" role and, consequently, evidence obtained from that entry should not be suppressed.

█ It is a novel argument, but we have no basis to extend *Cady* to the present case. Several obvious differences exist between the situation presented here and the situation in *Cady*. Several terms after deciding *Cady*, the Supreme Court explained the parameters of the police "community caretaking function."

In the interests of public safety and as part of what the Court has called "community caretaking functions," *Cady v. Dombrowski, supra*, at 441 [93 S.Ct. at 2528], automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobile's contents. These procedures developed in response to three distinct needs: the protection of the owner's property while it remains in police custody, the protection of police against claims or disputes over lost or stolen property, and the protection of the police from potential danger. The practice has been viewed as essential to respond to incidents of theft or vandalism. In addition, police frequently attempt to determine whether a vehicle has been stolen and thereafter abandoned.

*South Dakota v. Opperman*, 428 U.S. 364, 368–69, 96 S.Ct. 3092, 3096–97, 49 L.Ed.2d 1000 (1976) (citations omitted).

None of the factors which the Court found characterized the community caretaking function are present here. First, the police exercised no control or dominion over the property. In *Cady*, the court found it incongruous that the police would be required to hold the car but could not search it—even to protect themselves or the owner—without a magistrate's approval. Second, in contrast to *Cady* the police here were under no obligation to secure the warehouse or to preserve its contents where no threat of damage or theft was immediately present. Their presence on the industrial park grounds did not leave them exposed to claims of liability for lost or stolen property. The officers did not claim to have entered the defendant's warehouse to protect themselves or the public from potential danger. Except for its proximity to the site of the burglary, the physical ap-

pearance of the defendant's warehouse did not differ from other surrounding buildings which the officers did not enter. Standing in an isolated and infrequently traveled industrial park, none of the buildings appeared to require some police action to protect them from danger.

Aside from the other differences between *Cady* and the immediate case, the most obvious difference is that *Cady* involved the search of an impounded automobile while the present case involves the search of a business warehouse. Accepting the government's argument would require us to ignore express language in the *Cady* decision confining the "community caretaker" exception to searches involving automobiles. In *Cady*, the Supreme Court articulated several premises behind its decision which indicate that the holding in the case extended only to automobiles temporarily in police custody. The Court first noted that "a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Cady*, 413 U.S. at 439, 93 S.Ct. at 2527, *quoting Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967). Second, the Court stated that this principle applies in all "except . . . certain carefully defined classes of cases." *Id.* Finally, the Court in *Cady* emphasized that

> [o]ne class of cases which constitutes at least a partial exception to this general rule is automobile searches. Although vehicles are "effects" within the meaning

of the Fourth Amendment there is a constitutional difference between houses and cars. *Chambers v. Maroney,* 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970).

*Cady,* 413 U.S. at 439, 93 S.Ct. at 2527.[3] The Court, moreover, recently reaffirmed these principles in *United States v. Ross,* — U.S. —, —, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982).

> We reaffirm the basic rule of Fourth Amendment jurisprudence stated by Justice Stewart for a unanimous Court in *Mincey v. Arizona,* 437 U.S. 385, 390 [, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290]:
>
> > "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States,* 389 U.S. 347, 357 [, 88 S.Ct. 507, 514, 19 L.Ed.2d 576] (footnotes omitted)."
>
> The [automobile] exception recognized in *Carroll* is unquestionably one that is "specifically established and well-delineated."

Consequently, the plain import from the language of the *Cady* decision is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an "investigative," rath-

---

**3.** Again considering whether a warrantless search of an automobile under police "community caretaker" responsibilities violated the Fourth Amendment, the Supreme Court noted that the searches of automobiles might be permissible under circumstances where the search of a home or office might be prohibited under the Fourth Amendment.

This court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. Although automobiles are "effects" and thus within the reach of the Fourth Amendment, *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not.

The reason for this well-settled distinction is twofold. First, the inherent mobility of automobiles creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible. But the Court has also upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction. Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.

*South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (citations omitted).

er than a "criminal" function. *Cady*, 413 U.S. at 453, 93 S.Ct. at 2533 (Brennan, J., dissenting). The Court intended to confine the holding to the automobile exception and to foreclose an expansive construction of the decision allowing warrantless searches of private homes or businesses. The defendant has cited—and we have found—no cases extending *Cady* or the "community caretaking" exception beyond the automobile search context. We cannot justify adding a warehouse exception to the automobile exception.

The government advances no other argument to justify the officers' entry. At the district court the government argued that exigent circumstances existed which made the warrantless entry reasonable and justified a departure from the otherwise unquestioned principle under the Fourth Amendment that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 43, 66 L.Ed.2d 1 (1980), *quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *see also Payton v. New York*, 445 U.S. 573, 586 n.25, 100 S.Ct. 1371, 1380, n.25, 63 L.Ed.2d 639 (1980); *Torres v. Puerto Rico*, 442 U.S. 465, 471, 99 S.Ct. 2425, 2429, 61 L.Ed.2d 1 (1979); *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971).

▪ It is recognized that "[a] warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978). The Fourth Amendment does not require the police to obtain a warrant when a delay in the course of the investigation would "gravely endanger their lives or the lives of others," *Warden v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967), allow a suspect to escape, *Washington v. Chrisman*, 455 U.S. 1, 7, 102 S.Ct. 812, 817, 70 L.Ed.2d 778 (1982), or prevent the imminent destruction of evidence or private property, *Tyler*, 436 U.S. at 509, 98 S.Ct. at 1949; *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1969).

The government argued that the entry was justified under the exigent circumstances exception because the officers were searching for Hunter and investigating a burglary in a building they mistakenly believed Hunter rented. The district court rejected the argument, finding no exigent circumstances because the burglary had occurred hours before the officers arrived early for the meeting with Hunter, they did not believe he was in distress, and they eventually departed without locating him. The government does not argue exigent circumstances on appeal, so we need not examine that ruling.

As a final matter, the government asserts that the officers' "good faith" in entering the warehouse should excuse any violation of the Fourth Amendment. The government argues that the exclusionary rule, which effectively deters only intentional violations of the Fourth Amendment, should not apply when a policeman acts in good faith. *United States v. Williams*, 622 F.2d 830 (5th Cir. 1980), *cert. denied* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). The difficulty with considering that argument now is that there is no indication in the record that the government advanced it below in any way. It appears only that the district court raised the possibility *sua sponte* in the conclusion of its opinion, but did not rule on it.

▪ Though the district court had little doubt that the officers were acting in good faith, that assessment was based on the officers' demeanor and the tenor of their testimony. The good faith exception, where it has been explicitly recognized, provides that evidence is not to be suppressed under the exclusionary rule where that evidence was discovered by the officers acting in good faith and in a reasonable, though mistaken, belief that they were authorized to take those actions. *Williams*, 622 F.2d at

840–47. We find no effort in the record attempting to establish a basis for the good faith exception, so we necessarily decline to consider the issue.

For the foregoing reasons the decision of the district court is AFFIRMED.