**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald Joseph BUTE, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Beverly BUTE, a/k/a Beverly M. York, a/k/a Beverly M. Jensen, Defendant–Appellant.**

Nos. 93–4193, 93–4222.

United States Court of Appeals, Tenth Circuit.

Dec. 23, 1994.

David J. Schwendiman (Scott M. Matheson, Jr., U.S. Atty., with him on the brief), Asst. U.S. Atty., Salt Lake City, UT, for plaintiff-appellee.

Ronald J. Yengich of Yengich, Rich & Xaiz, Salt Lake City, UT, for defendant-appellant in No. 93–4222.

Loni F. DeLand of McRae & DeLand, Salt Lake City, UT, for defendant-appellant in No. 93–4193.

Before ANDERSON, MCKAY and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Defendants, Beverly and Ronald Joseph Bute ("the Butes"), bring this consolidated appeal challenging the district court's denial of their joint motion to suppress evidence allegedly obtained in violation of the Fourth Amendment. We have jurisdiction under 28 U.S.C. § 1291, and reverse.

I

At roughly 11:00 p.m., on March 20, 1992, Deputy Salt Lake County Sheriff Daniel McConkey began his shift by taking Deputy Cannon, the Deputy he was relieving, home. On the way, both officers noticed an open garage door at 13180 South 2700 West, Salt Lake County, Utah (the Bute building). Cannon identified the Bute building as an old honey manufacturing plant, though McConkey testified he was not aware of the building's present use. McConkey described it as a "[c]inder block building, [with] a small window, which would be on the front of the building, on the south side, and there's a walk door and there's a garage door next to that." The building was owned by Gene Fisher who had rented it to the Butes,

though the officers were not aware of these facts.

The open garage door aroused some suspicion in McConkey because he had never seen anyone around the building before and never noticed the garage door was routinely left open. Nevertheless, McConkey did not stop but rather, continued to building. While in his vehicle, McConkey shined his bright lights and search light into the garage, illuminating it. He testified at the suppression hearing from that vantage point he could see the garage contained some shelves on one wall, a chair, and what he described as "normal garage type stuff, gas cans." There was no vehicle in the garage, no indication that anyone was in or around the Bute building, and no sign of forced entry.

Nevertheless, and without articulating any reason, he suspected the building might have been vandalized or burglarized earlier and decided to enter the building in order to search for any indication of burglary or vandalism. He radioed to dispatch informing them he had "an open door" and "would be out to check it." He did not, however, request a backup as is customary when an officer suspects a possible burglary or other threat to property in progress.[1]

When McConkey entered the building through the garage door, he noticed what he described as a "very pungent" and unusual odor which he could not identify. Along a single wall in the garage were three doors, all of which were closed or only slightly ajar. He opened the first door, shined his flashlight inside, and saw it was a furnace room. He moved on to the second door, opened it, and saw a living-type area which contained a bed or sofa, chairs, a table with an ashtray, and a television. He called out to see if anyone was there but got no response. He then moved to the third door. He observed a room with some glass beakers and bottles, some of which had rubber tubing connected to them, and a television monitor on the floor. McConkey testified upon observing the contents behind door number three, he

suspected he had found a "lab of some sort." However, he was unable to identify what sort of lab it was or connect the lab to any criminal activity.

Once outside, McConkey called for a back-up officer. Sergeant Wood responded and McConkey informed him of what his search of the building had revealed. The two then reentered the building and went immediately to door number three. After observing the lab, the officers left. However, because the two were still apparently unaware of what it was they had found, they contacted metro narcotics as well as a hazardous materials team. The narcotics team arrived first, entered the building, and observed the lab. When the hazardous materials team arrived, they did the same. At no time did any of the officers attempt to locate or ascertain the owner or occupant of the building.

Eventually, a search warrant was obtained based on the information provided by McConkey, Sergeant Wood, and the metro narcotics officers. The search executed pursuant to that warrant revealed the lab was used for the manufacture of methamphetamines. Subsequently, additional search warrants were obtained and executed at various locations including the nearby residence of the Butes.

The Butes were charged, and later indicted, for possession of methamphetamine with intent to distribute and manufacturing methamphetamine, both in violation of 21 U.S.C. § 841(a)(1). The Butes filed a joint motion to suppress the evidence seized from the Bute building and any fruits of that evidence claiming the initial search was illegal. A hearing was held before Magistrate Judge Ronald N. Boyce who issued a report and recommendation denying the Butes' motion. The Butes then filed objections to the report and recommendation with the district court. After argument, the court issued an order adopting the report and recommendation of the magistrate judge.[2]

The Butes entered conditional pleas of guilty and now bring this appeal arguing the

---

1. McConkey testified at no time prior to his entry did he suspect a burglary was in progress.

2. Because the district court adopted the magistrate judge's report and recommendation in its entirety, we will refer to the magistrate judge's report as the trial court ruling under review.

magistrate judge's report and recommendation adopted a novel Fourth Amendment analysis that cannot be squared with the precedent of the United States Supreme Court or the precedent of this court. Application of the appropriate legal standard, they argue, requires reversal.

When reviewing a district court's denial of a motion to suppress, the trial court's findings of fact are accepted unless clearly erroneous. *United States v. Pena*, 920 F.2d 1509, 1513 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991). The ultimate question of whether a search is reasonable under the Fourth Amendment is a question of law which we review de novo. *United States v. McKinnell*, 888 F.2d 669, 672 (10th Cir.1989). "[W]hen the defendant challenges a warrantless search or seizure the government carries the burden of justifying the agents' actions." *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir.1993); *see also Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970).

## II

The magistrate judge concluded none of the recognized exceptions to the warrant requirement offered by the government applied under the facts of this case. Nevertheless, the magistrate judge went on to analyze the constitutionality of McConkey's search under a general "reasonableness" test, taking into account the totality of the circumstances. Under that standard, the magistrate judge concluded the search was reasonable, and therefore, constitutionally permissible.[3]

■ Under the Fourth Amendment to the United States Constitution, " 'one governing principle, justified by history and by current experience, has consistently been followed: *except in certain carefully defined classes of cases*, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search war-

rant.' " *Michigan v. Tyler*, 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978) (emphasis added) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1966)); *see also Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." (footnotes omitted)); *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir.1992).[4] Among those "well-delineated" exceptions to the warrant requirement are situations in which various forms of exigency exist, *see California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (need to detain a fleeing vehicle); *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (individual in need of emergency aid and assistance); *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970) (need to prevent destruction of contraband). Also included are stop and frisk searches, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and searches pursuant to voluntary consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ While the magistrate judge was correct in observing that "reasonableness," as the text of the Fourth Amendment indicates, is the touchstone for determining the constitutionality of a search, *see Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991); *Cady v. Dombrowski*, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), the precedent of the Supreme Court and this circuit is quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement. *See Jimeno*, 500 U.S. at 250–51, 111 S.Ct. at 1803. As such, precedent neither establishes nor condones application of an amorphous

---

3. The magistrate judge found, as a matter of fact, that the Bute building was a commercial structure, not a residential building as the Butes argued. This finding is adequately supported by the record and thus, will not be disturbed on appeal. *Pena*, 920 F.2d at 1513.

4. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984) (footnote omitted).

"reasonableness" test to determine the constitutionality of a warrantless search.

To the extent the magistrate judge's report can be read as an extension of *Cady*, we are of the opinion that the principle of *Cady* is inapplicable here. In *Cady*, the Supreme Court held that Wisconsin police officers who had arrested a Chicago police officer for drunk driving did not violate the Fourth Amendment in searching the suspect's car for a firearm. *Cady*, 413 U.S. at 447, 93 S.Ct. at 2531. Noting that the arresting officers believed that Chicago police were required to carry a service revolver with them at all times, the Court concluded the search was incident to the caretaking function of the local police to protect "the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of the vehicle." *Id.* at 447, 93 S.Ct. at 2531. In short, the search was justified because the officers reasonably believed that the car contained a gun, *id.* at 447–48, 93 S.Ct. at 2531, and was constitutionally permissible in light of "[t]he Court's previous recognition of the distinction between motor vehicles and dwelling places" *id.* at 447, 93 S.Ct. at 2531. *See, e.g., Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Cooper v. California*, 386 U.S. 58, 59, 87 S.Ct. 788, 789, 17 L.Ed.2d 730 (1967).

As the Ninth Circuit has recognized, "*Cady* clearly turned on the ' "constitutional difference' " between searching a house and searching an automobile." *United States v. Erickson*, 991 F.2d 529, 532 (9th Cir.1993) (quoting *Cady*, 413 U.S. at 439, 93 S.Ct. at 2527). As such, the *Erickson* court held *Cady* restricted the community caretaking exception to searches not involving homes or offices. *Erickson*, 991 F.2d at 532. In doing so, it cited with approval the Seventh Circuit's refusal to extend the community caretaking exception to the warrantless search of a warehouse. *Id.* (citing *United States v. Pichany*, 687 F.2d 204, 209 (7th Cir.1982)). The Seventh Circuit declined to extend *Cady*

to the warrantless search of a warehouse on the grounds that:

> [T]he plain import from the language of [*Cady* ] is that the Supreme Court did not intend to create a broad exception to the Fourth Amendment warrant requirement to apply whenever the police are acting in an "investigative," rather than a "criminal" function. The Court intended to confine the holding to the automobile exception and to foreclose an expansive construction of the decision allowing warrantless searches of private homes or businesses.

*Pichany*, 687 F.2d at 208–09.

 We agree with this line of authority holding the community caretaking exception to the warrant requirement is applicable only in cases involving automobile searches. Thus, we conclude the community caretaking exception to the warrant requirement is inapplicable under the facts of this case.

### III

On appeal, the prosecution argues McConkey's search of the Bute building was justified under the so-called "security check" exception to the warrant requirement as well as the exigency recognized for the protection of property. For the reasons that follow, we decline to recognize the security check exception to the warrant requirement of the Fourth Amendment and conclude that the protection of property exception is inapplicable under the facts of this case.

### A

At least three state courts have held that law enforcement officials need not obtain a warrant in order to enter commercial premises, for the purposes of securing them, when they are found to be unlocked or otherwise open at night.[5] The leading case, *Alaska v. Myers*, 601 P.2d 239 (Alaska 1979), involved two officers who routinely walked through the downtown area of Juneau checking for unlocked doors at commercial establishments. At 2:30 a.m., they observed an open door at the end of corridor leading from a

---

**5.** We are aware of no federal court case recognizing this exception to the warrant requirement and the government points to none.

back alley. The officers entered the building (a movie theater) and observed individuals with cocaine and drug paraphernalia. *Id.* at 241.

In permitting use of the evidence gathered as a result of the search, the Alaska Supreme Court noted none of the previously recognized exceptions to the warrant requirement were applicable under the facts. In recognizing a new exception to the warrant requirement, the court held:

> [L]aw enforcement personnel may enter commercial premises without a warrant only when, pursuant to a routine after-hours security check undertaken to protect the interests of the property owner, it is discovered that the security of the premises is in jeopardy, and only when there is no reason to believe that the owner would not consent to such an entry.

*Id.* at 244.

In *California v. Parra,* 30 Cal.App.3d 729, 106 Cal.Rptr. 531, *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973), the California Court of Appeals upheld the warrantless search of commercial building motivated by a desire to secure the premises. *Id.;* 106 Cal.Rptr. at 533. The officer, responding to an "open door" call, entered the premises and in an effort to discover the owner of the business, searched through papers he found on the top of a desk. Finding nothing, he opened the desk drawers looking for information concerning the proprietor of the business. Instead, he found heroin.

The California court upheld the officer's entry on the grounds it would not have constituted a trespass under the law of torts, *see id.* at 533 (citing Restatement (Second) of Torts § 197) (2d ed.), and thus, the officer's presence in the shop was "privileged." *Parra,* 106 Cal.Rptr. at 533. In reaching this conclusion, however, the court did not mention the Fourth Amendment or the analogous provision of the California Constitution.[6]

Similarly, in *Illinois v. Gardner,* 121 Ill. App.3d 464, 76 Ill.Dec. 761, 459 N.E.2d 676 (1984), as part of a routine check of busi-

nesses an officer discovered an open door to an automobile repair shop at 4:00 a.m. Following departmental policy, he entered the premises in order to search for intruders and ascertain the owner of the business. *Id.,* 76 Ill.Dec. at 763, 459 N.E.2d at 678. Once inside, he observed a vehicle that was later determined to be stolen.

Relying on *Myers* and *Parra,* the Illinois Court of Appeals concluded that "law enforcement officials may enter an unsecured or unlocked commercial establishment during a nighttime security check to secure the premises and may take necessary measures to ascertain the identity of the proprietor." *Gardner,* 76 Ill.Dec. at 765–66, 459 N.E.2d at 680–81.

■ The Fourth Amendment protects an individual's reasonable expectation of privacy in commercial premises. *See, e.g., Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. City of Seattle,* 387 U.S. 541, 543, 87 S.Ct. 1737, 1739, 18 L.Ed.2d 943 (1967) ("The businessman, like the occupant of a residence, has the constitutional right to go about his business free from unreasonable official entries upon his private commercial property."); *United States v. Chavez,* 812 F.2d 1295, 1299 (10th Cir.1987). While it may be said as a general rule that there is a lesser expectation of privacy in commercial as contrasted with residential buildings, *cf. Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980), classifying a building as "commercial" is not dispositive as to the level of privacy that attaches to such premises. On the contrary, the reasonable expectation of privacy in any given property turns on the particular nature and circumstances surrounding the place to be searched. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 152–53, 99 S.Ct. 421, 435, 58 L.Ed.2d 387 (1978); *United States v. Chadwick,* 433 U.S. 1, 11–12, 97 S.Ct. 2476, 2483–84, 53 L.Ed.2d 538 (1977).

■ In our judgment, it is beyond question that some commercial properties are

---

6. As for the officer's search of the desk and its contents, the court concluded it was justified based on exigent circumstances, *i.e.,* the "emergency presented by the discovery of an unlocked business premise." *Id.,* 106 Cal.Rptr. at 535.

reasonably accorded a greater level of privacy than others. For instance, if a proprietor has made a general public invitation to enter the premises, there would be a lesser expectation of privacy than in a commercial building that is not open to the public, such as a warehouse. As such, a lesser expectation of privacy likely would attach to the showroom of a car dealership than to a law office where guarded confidential files are kept or a warehouse in which the public is neither invited nor allowed. *See* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.2(e) (1985) ("Law enforcement officials may enter commercial premises at the times they are open to the public ... [but may not] enter without consent premises to which the public at large does not have access."). Similarly, there is a lesser expectation of privacy in commercial premises open to the public during business hours as opposed to after hours when no employees are present. *United States v. Swart*, 679 F.2d 698, 701 (7th Cir. 1982).

The recognition that not all commercial establishments carry the same reasonable expectation of privacy creates an obvious problem for the security check exception to the warrant requirement. Indeed, this difficulty is even one that has been recognized by some courts that have adopted the exception. For instance, the Alaska Supreme Court in *Myers* correctly recognized that "[e]xpectations of privacy are not all of the same intensity.... Both subjectively and in society's judgment as to what is reasonable, distinctions may be made in the varying degrees of privacy retained in different places and objects." *Myers*, 601 P.2d at 242 (footnotes omitted). We also agree with the observation that "[i]ndividual proprietors who, for any number of legitimate reasons, may not desire even the most cursory searches of their business premises at any time, are entitled to have their right to such privacy protected." *Id.* at 243.

Yet the security check exception applies to *all* commercial establishments found unsecured—it makes no accommodation for the particular nature and circumstances surrounding individual buildings. Given this fact, we are of the opinion that the rule of *Myers* falters under the burden of its own reasoning. The security check exception to the warrant requirement permits entry onto premises based solely on the fact that a door is open or unlocked at night. There are no exceptions. As such, we have little difficulty concluding that the adoption of such a wholesale exception to the warrant requirement of the Fourth Amendment requires an unjustifiably simplistic conception of commercial property and the relative expectations of privacy that attach thereto. Accordingly, we decline to adopt the security check exception advanced by the government.

**B**

The government next argues McConkey's entry into the Bute building was justified under the protection of property exigency recognized in *Tyler*, 436 U.S. 499, 98 S.Ct. 1942.[7] We agree with the government's admission that *Tyler* is not directly on point, but disagree with its contention that the underlying principle recognized in *Tyler* is broad enough to render the search at issue constitutionally permissible.

In *Tyler*, fire department officials responded to a report of a burning building. In the course of their efforts to combat the blaze, the firefighters observed two plastic containers of flammable liquid inside the building. The official responsible for determining the cause of the blaze was informed of this fact and, suspecting arson, entered the building to examine the containers and photograph the interior of the building. The official was forced to abandon his efforts due to excessive smoke and steam. After the fire was extinguished, the firefighters left the scene. They removed the two containers and brought

7. The basic aspects of the "exigent circumstances" exception are that (1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.
*United States v. Smith*, 797 F.2d 836, 840 (10th Cir.1986).

them to the fire station for safekeeping. *See Tyler*, 436 U.S. at 501–02, 98 S.Ct. at 1945–46. No consent had been obtained for any entry into the building or for the removal of the containers. The defendants, who were tried for conspiracy to burn real property, moved to have all the evidence suppressed on the grounds that it was obtained without a warrant and without their consent.

The Supreme Court first concluded the invasion of privacy that results from a fire official's entry into a commercial establishment is "clearly within the protection of the Fourth Amendment." *Id.* at 505, 98 S.Ct. at 1947. However, the Court held "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." *Id.* at 509, 98 S.Ct. at 1950. Thus, the Court concluded the initial entry into the building was reasonable and the Fourth Amendment was not violated by the seizure of evidence of arson in plain view. *Id.*

■ While *Tyler* establishes the general principle that the need to protect property may justify a warrantless entry of premises, it is equally clear the application of that principle rests on a clear showing of an immediate need to protect property. The immediacy of the need for protection was so obvious in *Tyler* it required no elaboration or explanation.

■ Unlike a burning building, however, no evidence of any emergency or immediate threat to the Bute building was shown here. To put it simply, a burning building is not the same as an open garage door in terms of the immediacy of threat each presents. As such, the exigency identified in *Tyler* for the protection of property against an immediate threat is inapplicable here.

*United States v. Moskow*, 588 F.2d 882 (3rd Cir.1978), similarly is inapplicable. In *Moskow*, the police, "responding to specific information of a surreptitious entry into a vacant building at a late hour of the night," *id.* at 892, approached the building where they detected a strong odor of gasoline. The

court held the fumes, taken together with the possibility that the reported intruder was either still in the building or had left a fuse or delay mechanism behind to ignite the gasoline, constituted an exigent circumstance justifying the warrantless entry into the building in order to protect the property. *Id.* at 892–93.

In contrast, McConkey had no information regarding a surreptitious entry into the Bute building. In addition, there was no indication whatsoever that an intruder was in the building or had left behind anything which posed a threat to McConkey or anyone else. In fact, McConkey testified he did not think anyone was in or around the building. He simply had a hunch that criminal activity might have occurred.

The government suggests the odor of gasoline in *Moskow* is analogous to the strong odor McConkey perceived upon entering the Bute building—both warranting further investigation as to source and possible danger created as a result. However, McConkey did not smell the odor from the Bute building until after he had entered it. The question we are confronted with here is whether his initial entry was constitutionally permissible. As such, anything he may have found or perceived after his entry is irrelevant to our inquiry as information obtained after the entry obviously cannot serve to justify entry in the first place.

The holdings of *Tyler* and *Moskow* unquestionably support the proposition that in some circumstances, the need to preserve and protect private property may create an exigency justifying the warrantless search of property. We are of the opinion that no such exigency existed here.

In this respect, *United States v. Moss*, 963 F.2d 673 (4th Cir.1992), is instructive. In *Moss*, an officer of the United States Forest Service investigated an illegally parked car blocking access to a road. He approached a forest service cabin where he thought the owner of the vehicle might have been. He observed there was no lock on the cabin door and saw fresh bike tracks around the cabin. *Id.* at 675. Based on these facts, he entered the cabin out of three concerns: he thought the cabin may have been broken into; he

wanted to locate the owner of the illegally parked vehicle; and he was concerned that the owner of the car might be lost, injured, or dead. *Id.*

The Fourth Circuit addressed the government's argument that the entry of the cabin was justified to protect persons or property from immediately threatened harm. The court recognized the protection of property may constitute an exigency sufficient to permit police to "enter premises without warrants for such emergency purposes as aiding in fire-fighting, giving first aid to people in distress, protecting persons or property from threatened harm, and the like." *Id.* at 678.

"To invoke this so-called 'emergency doctrine,'" the court held, "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." *Id.* (citing *Wayne v. United States,* 318 F.2d 205, 211–12 (D.C.Cir.) (plurality opinion), *cert. denied,* 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *Root v. Gauper,* 438 F.2d 361 (8th Cir.1971)); *see also Smith,* 797 F.2d at 840 ("the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others"). The *Moss* court concluded while the officer's motivations were laudable, there was nothing about the circumstances presented supporting the officer's impression that an immediate threat to person or property existed, and therefore, the warrantless entry of the cabin was unreasonable. *Id.* at 840–41.

■■■ The same conclusion holds true under the facts of this case. We simply cannot accept the notion that an open door of a commercial building at night is, in and of itself, an occurrence that reasonably and objectively creates the impression of an immediate threat to person or property as to justify a warrantless search of the premises. McConkey observed an open garage door at a commercial establishment at 11:00 p.m. Whatever suspicion he had regarding the security of the building, it was not so great as to distract him from taking Cannon home. He did not know if the building was commer-

cial, residential, or abandoned. He was ignorant of the building's current use and thus could not have known if the commercial activity potentially being conducted there required activity at night. While McConkey testified there was no indication that anybody was in the building, he could not have known for sure. He did not knock on the walk-up door to see if anyone would answer, nor did he attempt to reach any possible occupants of the building by telephone (as was departmental practice with "open door" inquiries). Rather, he simply observed a door to a commercial building was open and based on that fact, and that fact alone, decided to enter the building and search it for indicia of burglary or vandalism. While he suspected the building might have been vandalized or burglarized earlier, there was nothing to indicate that was the case apart from the open garage. Illuminating the garage, which undoubtedly was legal for him to do as it was open for all to see, *see Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), revealed no evidence of foul play.

■■■ Based on these facts, we have little difficulty concluding whatever degree of suspicion or concern the open door may have reasonably aroused in McConkey, that suspicion falls far short of that needed to justify the warrantless entry into the Bute building. Nothing known to McConkey prior to his search supports an objective, reasonable belief that an emergency existed requiring the immediate entry into the Bute building to prevent harm to the building or its contents. To hold otherwise would require this court to either adopt the security check exception to the warrant requirement or stretch the principle of *Tyler* far beyond its intended and logical reach. This, we decline to do. Accordingly, we hold McConkey's warrantless search of the Bute building violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

**IV**

In so holding, we are mindful both of an officer's desire to protect the citizens and property on his or her patrol and the public's

expectation regarding the protection of commercial property. In holding as we do, we do not suggest an officer can never enter commercial premises that are left open at night. We simply conclude a warrantless entry only is permitted under the Fourth Amendment when the officer has an objectively reasonable belief that an emergency exists requiring immediate entry to render assistance or prevent harm to persons or property within. While the infinite array of facts that may satisfy this requirement must be assessed on a case-by-case basis, it is clear that observing an open and unsecured building, without more, does not. In our judgment, the Fourth Amendment rights of all citizens outweigh the (lesser) expectations of some business owners that law enforcement authorities will enter and secure commercial premises found open at night.

The evidence seized as a result of McConkey's unconstitutional search of the Bute building must be suppressed.[8] Therefore, the ruling of the district court is **REVERSED** and the case remanded with instructions to the trial court to grant the motion to suppress and for such other and further proceedings as may be just and proper.

STEPHEN H. ANDERSON, Circuit Judge, dissenting:

The structure we are talking about in this case is described in defense Exhibit 1 admitted into evidence at the suppression hearing. Tr. at 38. Defense counsel acknowledged that the drawing is not to scale, and he inserted conclusory word descriptions which we disregard as unsupported by the testimony, and contrary to factual findings by the magistrate judge, R & R at 10, which are not clearly erroneous. Tr. at 35, 37. Additionally, in his testimony, Officer McConkey corrected the failure of the drawing to show a door from the small furnace room into the adjacent area. *Id.* at 35–36. The drawing, however, reveals some important facts bear-

ing on the reasonableness of the officers' entry; so I am attaching a copy.

According to Exhibit 1 and testimony at the hearing, the building is a very small single-story detached cinder block structure with a flat corrugated iron roof. There is a single, barred window in front, a door and a garage door about seven feet high and fourteen feet wide. *Id.* at 11. The drawing shows that the "garage" is actually a work area occupying the entire north side, and probably more than one-half of this small building. There are three small rooms on the south side of the structure. The rooms have no interconnecting doors or hallway. Rather, they open directly into the work area, so the only way to go from one room to the other is to go into the work area. The rooms are, therefore, auxiliary to the work area, not to each other. There is no lavatory, bath or shower, and no kitchen. Clearly, as the magistrate judge found, this is no residence, R & R at 10, and there is no evidence that anyone lived on the premises. *Id.* at 14. It is a small, light industrial structure—a commercial building, as the lower court found, as shown by its analysis, *id.* at 15–30, and direct statement. *Id.* at 25. Furthermore, when Officers McConkey and Cannon drove past the building, Officer Cannon identified it as "the old honey manufacture." Tr. at 10–11. The dominant feature of this small commercial building, both by the space it occupies, and the configuration of the rooms which open off the space instead of into each other, is the "garage" or work area.

When officers McConkey and Cannon, on a routine patrol schedule, drove past this unlighted commercial building at approximately 11:15 p.m., they saw that the "garage" door was open, noting that that was an abnormal circumstance, especially at night. Officer McConkey knew from ten years' personal experience in the area that the open door was unusual. He had never seen it open before, and had never seen "anybody around what was a business." *Id.* at 9, 11.

---

8. The government concedes all of the evidence against the Butes for which suppression is sought are the fruits of McConkey's initial search of the Bute building. Thus, the prosecution acknowledges that if McConkey's initial entry is determined to be unconstitutional, all of the resulting evidence must be suppressed. *See Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *United States v. King,* 990 F.2d 1552, 1563 (10th Cir.1993).

Accordingly, after officer McConkey dropped off officer Cannon at his house, he returned to the building and positioned his police car so that the headlights and spotlight illuminated the entire work area, fully visible because of the open door. Officer McConkey then got out of his squad car, walked into the open area, looked around, and saw nothing unusual. He then walked over to the three doors opening off the work area. One of those doors was partly open. *Id.* at 16. The officer then briefly opened the doors, shined his flashlight around the interior of each small room and, in the process, yelled "anybody in there?" *Id.* In the last room he saw lab equipment from the doorway and a TV monitor with a cable running to an observation camera in the window by the door in front. He also smelled a pungent odor which caused his tongue to tingle. *Id.* at 15.

With the "garage" door up, this structure and its contents were almost entirely exposed and accessible to anyone. One of the interior doors was partly open. It was the middle of the night. The commercial nature of the building and the fact that it was dark and appeared deserted caused the officer on patrol to investigate. That investigation was limited to shining a flashlight, looking, and assessing if anyone was there. Nothing was touched; the officer did not rummage through any of the building's contents. He only looked.

The officer conducted this check of the premises to protect the owner's property and safeguard the community, not to search for evidence against the owner or tenant. The average citizen will be dumbfounded at the notion that this officer was prohibited by the Federal Constitution from checking on the safe condition of these premises, under these circumstances, in the manner described. Subsequent thirty-second entries by Officer McConkey's supervisor, and a single narcotics officer, and a brief entry by the hazardous materials team did nothing to enlarge the scope of the original entry by Officer McConkey. There was no rummaging. Then a warrant was promptly sought, as early as 3:00 a.m.

Society would not only tolerate this level of intrusion into a mostly open commercial building at night, it would demand it.

## A.

It is questionable whether the Fourth Amendment is implicated at all when an officer on patrol enters a commercial structure standing wide open to "check out" what can already be seen from outside.

Although at one time the concept of "search" hinged on principles of physical intrusion or trespass, *see, e.g., Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), over the last several decades, the presence or absence of a physical intrusion has ceased to be the focal point of Fourth Amendment analysis. Instead, the Supreme Court has made it clear that a search occurs only when a reasonable expectation of privacy is impinged. *Katz v. United States,* 389 U.S. at 353, 88 S.Ct. at 512 ("[T]he reach of [the Fourth Amendment] cannot turn upon the presence or absence of a physical intrusion."). In *Katz,* the Supreme Court, "for the first time explicitly overruled the 'physical penetration' and 'trespass' tests enunciated in earlier decisions." *Desist v. United States,* 394 U.S. 244, 250, 89 S.Ct. 1030, 1034, 22 L.Ed.2d 248 (1969). This Circuit has specifically held that mere entry into private premises does not automatically implicate the Fourth Amendment. *Artes–Roy v. Aspen,* 31 F.3d 958, 962 (10th Cir.1994) (concluding inspector's opening door to plaintiff's residence and stepping into entryway without warrant or proper consent did not implicate the Fourth Amendment).

But assuming arguendo that the Fourth Amendment was implicated at some point here because Officer McConkey opened two doors (the third was already ajar) and shined his light inside, the officer's conduct was not constitutionally unreasonable. From earliest times in England and in this country emphasis has been placed on the role played by the police in preventing crime, preserving order, and protecting persons and property. I ABA Standards of Criminal Justice §§ 1–2.1(a), 1–2.2(b) (2d ed. 1980).

[M]ost police efforts have been directed at making their presence felt to the maximum

degree through random and conspicuous patrol—seeking thereby to create an impression of police omnipresence. *In the course of their patrol activities, police identify and correct conditions, such as open premises, that increase the opportunity for criminal. activity and also check out suspicious circumstances and persons. Id.* § 1–2.2(b).

It is also a recognized fact that the police perform this patrol and check function as a result not just of community expectation but community pressure. Thus, "commercial interests, for example, typically want more time devoted to checking the security of their establishments...." *Id.* § 1–2.1. In short, checking out commercial premises inexplicably left not just unlocked but wide open in the middle of the night is not an activity society tolerates; it is one society demands. *See* Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 6.6(b) (2d ed. 1987) ("Indeed, entry would be permissible when commercial premises are found to be unlocked and unattended in the evening hours.").

State courts have long recognized that security checks by patrolling officers in no way offend the reasonableness requirement of the Fourth Amendment. *See, e.g., Alaska v. Meyers,* 601 P.2d 239 (Alaska 1979); *California v. Parra,* 30 Cal.App.3d 729, 106 Cal. Rptr. 531, *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *Illinois v. Gardner,* 121 Ill.App.3d 464, 76 Ill.Dec. 761, 459 N.E.2d 676 (1984). While the majority opinion downplays the significance of these cases by pointing out that the exact same reasoning has not appeared in cases from federal courts, I see it differently. State courts are the natural source for cases on this subject. Security patrols of business and private premises are a function and concern of local law enforcement and communities, and typically involve state law. Thus, the issues will naturally be played out more in state than federal courts.

Regardless, it is beyond dispute that the Supreme Court has recognized that police officers perform a community caretaking function wholly separate from the detection and arrest of criminals. *Cady v. Dombrow-*

*ski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973); *see also United States v. King,* 990 F.2d 1552, 1560 (10th Cir.1993). While the Court has not explicitly extended this self-evident concept to security checks of commercial premises, it has not ruled that such a function would violate the Fourth Amendment. To the contrary, there are significant indications it would not do so. In *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987), the Court recognized that "[a]n expectation of privacy in commercial premises ... is different from, and indeed less than, a similar expectation in an individual's home." And where, as in this case, the security check is to protect the owner's property, not to incriminate the owner, the Court's observation in *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967) is apt: Where searches are "neither personal in nature nor aimed at the discovery of evidence of a crime, they involve a relatively limited invasion of ... privacy." Furthermore, the purpose of the security check serves to limit the degree of intrusiveness of the "search" because "the scope of [the] search must be strictly limited to the circumstances which rendered its initiation permissible." *Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968).

This latter restriction in the scope of the entry is one of the reasons why I do not accept the premise of the majority that, for instance, the confidentiality of law firm files might be compromised by the entry through an open door of a patrolling officer anxious to check on the safety of the property. Rummaging is not part of a security check, and it is absent in this case.

In any event, I see no reason why this case requires us to adopt or reject a broad "security check" exception to the warrant requirement covering every imaginable situation. I summarize where I began: Fourth Amendment issues are highly fact specific, resolved on a case-by-case basis, with reasonableness as the touchstone. *See Cooper v. California,* 386 U.S. 58, 59, 87 S.Ct. 788, 789, 17 L.Ed.2d 730 (1967); *see also, e.g., Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991); *Illinois v. Rodriguez,*

497 U.S. 177, 185, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148 (1990); *NTEU v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989); *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Pennsylvania v. Mimms,* 434 U.S. 106, 108–09, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977); *United States v. Chadwick,* 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977); *Cady v. Dombrowski,* 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973); *Cooper v. California,* 386 U.S. at 62, 87 S.Ct. at 791 (1967); *United States v. Carr,* 939 F.2d 1442, 1448 (10th Cir.1991) (providing reasonableness is the overriding test of compliance with the Fourth Amendment).

We are not dealing with any of the hypotheticals postulated by the majority—only with the reasonableness of Officer McConkey's entry into a dark, wide-open commercial building, in the middle of the night, to shine his flashlight around for the purpose of protecting the premises. He did no rummaging, conducted no search for evidence. If the Fourth Amendment was involved at all, or at some point in this initial check of rooms, then, in respectful disagreement with the majority, I think the activity was reasonable.

**B.**

The appellants have waived any separate argument on appeal that the subsequent entries by McConkey's supervisor, Sergeant Wood, Officer Lyman of the narcotics squad and technician Kevin Greer of the Salt Lake County Fire Department's Hazardous Materials Unit, violated the Fourth Amendment. Their brief on appeal focuses exclusively on the lawfulness of officer McConkey's initial entry, as did their objections to the magistrate judge's report and recommendation, and their argument to the district court. Significantly, the magistrate judge identified McConkey's entry as the only issue. R & R at 13. At the suppression hearing the appellants put on no evidence to show that the subsequent entries exceeded the scope of officer McConkey's entry or were extended in time—either response time or time in the building and, those points are not pursued at any juncture by the appellants, either below or in their arguments on appeal. Consistent with the appellants' approach, the majority opinion focuses exclusively on the initial entry by McConkey.

However, assuming for purposes of argument that we have a real issue before us separately challenging the reasonableness of the subsequent entries, that issue must also be resolved in favor of the district court's denial of the motion to suppress.

As explained above, the recognizable privacy expectations of these lessees were reduced to begin with because of the commercial nature of the premises. These expectations were further diminished by the fact that they (apparently) left the building literally wide open.

Officer McConkey lawfully, as I contend, checking the well-being of the owner's property, saw the room full of laboratory equipment, and could smell and taste from the air its chemical product. At that point what little expectation of privacy the lessee's had in the lab room was already lost. It is hard to explain on any practical basis how subsequent officers' confirming observations of the same thing McConkey saw, smelled, and tasted constituted any more than a de minimus intrusion on what was no longer private. This is so regardless of the difference in their reasons for looking at what McConkey had already looked at.

The Fifth Circuit, for example, has previously noted that

the fourth amendment protects the citizen against invasion of privacy. Once that interest is invaded legally by a [government agent], the citizen has lost his reasonable expectation of privacy to the extent of the invasion. As this court has held repeatedly, additional investigators or officials may therefore enter a citizen's property after one official has already intruded legally.

*Vance v. United States,* 676 F.2d 183, 188 n. 8 (5th Cir.1982); *see, e.g., United States v. Brand,* 556 F.2d 1312, 1317 (5th Cir.1977) (concluding that when one law enforcement official justifiably enters dwelling without a

warrant, later arrivals "may join their colleagues even though the exigent circumstances justifying the initial entry no longer exist"), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978); *United States v. Green,* 474 F.2d 1385, 1390 (5th Cir.) ("Where a lawful intrusion has already occurred ... invasion of privacy is not increased by an additional officer ... who is an expert in identifying the type of contraband discovered, entering the premises to confirm the belief of the officer and to take custody of the evidence."), *cert. denied,* 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973).

Two further facts in this case-by-case, fact-intensive inquiry, support the de minimus additional intrusion argument. First, there was no rummaging. The individuals who subsequently entered the building did not appreciably expand the scope of what Officer McConkey did at the outset. No drawers were opened; there was no search of papers or other effects or paraphernalia.[1] The other officers only observed what McConkey observed, in plain view. There is no evidence to the contrary proffered by the defense. McConkey looked; the others looked—all at the same thing.

The intrusion was further minimized by the limited number of people who entered the structure. Although several different groups responded to the hazardous situation, only a few individuals actually entered the building. Sergeant Wood walked into the open area for about thirty seconds. Narcotics Officer Lyman was the only agent from metro narcotics to enter the structure, also for about thirty seconds. Tr. at 20–21. Hazardous materials team members were at the scene, but no testimony was elicited about the details of their entry. The affidavit mentions only Greer. The remaining officers, including officers from the Utah Division of Investigations who subsequently arrived, apparently never entered the premises and secured the building from the outside. Def.'s Ex. 2, Attach. C ¶ 12.

Second, the events were reasonably related in time, considering that it was the middle of the night, and brief. Officer McConkey was in the building for three to four minutes. R & R at 10. Sergeant Wood arrived about ten to fifteen minutes later, Tr. at 40, and, as indicated above, was in the building only thirty to forty-five seconds. R & R at 10. Officer Lyman of narcotics was in the building only thirty to forty-five seconds. Apparently, technician Greer was in the building only enough longer to look at labels on some containers, draw a building diagram, and take a sample of the air. There is no evidence showing when officer Lyman and technician Greer arrived on the scene, but it would not have been more than an hour or two at the outside because a search warrant was applied for as early as 3:00 a.m. *Id.* at 11. It is noteworthy that the defense made no issue of the time interval as regards the arrival of Lyman and Greer, and introduced no evidence on the subject. Thus, as indicated above, I regard any argument on elapsed time as waived.[2]

---

1. Apparently, according to the affidavit for the warrant, introduced by the defense, technician Greer looked at labels on the chemical containers in full view, and sampled the air for dangerous substances, and found the air was in fact dangerous.

2. The hazard posed by the chemicals present in this case created a public safety issue from the outset, and was at all times inextricably intertwined with the perceived criminal conduct—a methamphetamine laboratory. Although officer McConkey could not identify the kind of lab he saw, or the chemical smell, the chemical presence in the air was so strong it made his tongue tingle, and he would not enter the lab room out of fear of contamination. Tr. at 46. After Sergeant Wood confirmed what McConkey saw, *both* narcotics *and* HAZMAT were called. According to the affidavit, Greer of HAZMAT could smell and identify the chemical from outside the building. He went into the area and sampled the air, finding it so dangerous that he ordered the building evacuated. Def's Ex. 2, Aff. ¶ 11. All of this would justify a warrantless entry by itself. *See, e.g., United States v. Erb,* 596 F.2d 412 (10th Cir.1979) (hazards posed by methamphetamine lab on premises contributed to justifiable warrantless entry based on exigent circumstances); *United States v. Whitten,* 706 F.2d 1000, 1014 (9th Cir.1983) (risk of explosion of a methamphetamine lab in operation presented an exigent circumstance that would have justified an immediate warrantless search); *United States v. Spinelli,* 848 F.2d 26 (2d Cir.1988) (officers failure to follow knock and announce statute in exercising warrant was justified by exigent circumstances due in part to the violent and flammable nature of methamphetamine, which defendant

*Katz* did not purport to freeze Fourth Amendment analysis into warrants and pigeon holes. The warrant exceptions then and thereafter recognized are simply ways of expressing reasonableness for Fourth Amendment purposes. As indicated above, the Fourth Amendment text and, therefore its test, is reasonableness. *See Jimeno,* 500 U.S. at 250, 111 S.Ct. at 1803; *Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. at 3308; *Sharpe,* 470 U.S. at 682, 105 S.Ct. at 1573; *Mimms,* 434 U.S. at 108–09, 98 S.Ct. at 332; *Chadwick,* 433 U.S. at 7, 97 S.Ct. at 2481. Any other view would have made our decision in *Artes–Roy v. Aspen,* 31 F.3d 958 (10th Cir.1994), impossible.

These entries, in my opinion, were not unreasonable under the Fourth Amendment. Accordingly, I respectfully dissent.

was believed to have been producing in his home).

However, the government, for some reason not appearing in the record, did not bring in Greer to testify, allowing McConkey's uneducated statement that no hazard existed to stand. Tr. at 21. This led to a similar finding by the magistrate judge. R & R at 6.