IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 18, 2013 Session

**STATE OF TENNESSEE v. JUSTIN GIBSON**

**Appeal from the Circuit Court for Williamson County**
**No. II-CR124574      James G. Martin, III, Judge**

_____

**No. M2012-02363-CCA-R3-CD      Filed October 18, 2013**

_____


The Defendant, Justin Gibson, entered a guilty plea to driving under the influence, first offense. He agreed to a sentence of eleven months and twenty-nine days, all of which was suspended after seven days' incarceration. As a condition of his guilty plea, the Defendant reserved a certified question of law challenging the warrantless search of his home as not justified by either consent or exigent circumstances. After a thorough review of the applicable law, we conclude that the officer's entry into the Defendant's home was supported by neither exigent circumstances nor as a part of the community caretaker function; therefore, the trial court erred when it denied the Defendant's motion to suppress. Accordingly, we reverse the judgment of the trial court and dismiss the charge against the Defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Jeremy W. Parham, Manchester, Tennessee, for the appellant, Justin Gibson.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Kim R. Helper, District Attorney General; and Sean B. Duddy and Kelly A. Lawrence, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

During the early morning hours of July 11, 2009, Captain Tommy Walsh of the Brentwood Police Department responded to an accident call near the Brentwood city limits.

At the one-car accident scene, no one was found at or near the vehicle. After obtaining the vehicle's registration information, Captain Walsh proceeded to the residence of the registered owner and subsequently went inside. The Defendant was found passed out in an upstairs bedroom and later admitted to driving under the influence (DUI). A blood alcohol test was also performed. He was thereafter arrested and charged with alternative counts of DUI, leaving the scene of an accident, and underage consumption of alcohol. See Tenn. Code Ann. §§ 1-3-113, 55-10-104, 55-10-401.

The Defendant filed a motion to suppress the statements he made to emergency personnel and the resulting blood alcohol test, arguing that there were no exigent circumstances to permit Captain Walsh's entry into his home and that all evidence obtained after the unconstitutional entry should be suppressed. The trial court held a hearing on the motion.[1]

At the hearing, Captain Walsh testified that, on July 11, 2009, at approximately 2:46 a.m., he responded to an accident report "near the city limits" in the westbound lanes of Concord Road. Upon his arrival at the one-car accident scene, he noticed a green, Nissan Altima "off the roadway rolled over" in a ditch. Both of the vehicle's airbags had been deployed. He described the accident as follows: "It appeared that it had struck a tree . . . . And obviously it had rolled over. The damage was consistent enough to deploy the airbags, which would have been fairly significant." Captain Walsh further stated that the vehicle was in "a grassy area" and "that it was muddy in the area where the car had run off the road."

Upon searching the interior of the vehicle and the nearby area, Captain Walsh was unable to locate the driver, so he ran the vehicle's licence plate and obtained the registration information. Once another officer had arrived at the scene to continue the investigation at the accident site, Captain Walsh proceeded to the registered address, which he estimated was approximately "a half-a-mile from the scene." He stated that he went to the registered address because, "Obviously I was concerned that there might have been an injury either to a driver or an occupant in the car because of the amount of damage."

When Captain Walsh arrived at the house around 3:00 a.m., he "pulled up near the front door of the house" and "immediately noticed that the front door to the house was standing open." According to Captain Walsh, he "could see inside the house from outside." He went to the front porch to investigate the open door, and although the door was "wide open[,]" he did not observe any signs of forced entry. Captain Walsh then walked around

---

[1] The suppression issues were addressed by a different judge, The Honorable Timothy L. Easter. Judge Easter conducted the suppression hearing and entered the subsequent order denying the motion.

the perimeter of the house, and as he was coming "back around the other side of the house[,]" he encountered Martin Walker, a next-door neighbor, who had come outside to speak with him. Captain Walsh explained that Mr. Walker gave him the following additional information:

> [H]e told me he was watching the house while the owners were away. I spoke with him briefly. He said he had a garage code where he was going in and out of the garage, I think to watch after some animals that were inside. That he had checked the house earlier that evening. I asked him if he had left the front door open either by accident or if he knew if it had been open. He said he had not, that it was closed earlier, which obviously was unusual . . . .

At that point, Captain Walsh decided he should go inside the residence to "check to see if someone was injured from the crash or . . . there could have been a break-in." He elaborated, "I really don't know what's happening. There could have been an incident that occurred at the house which led to the car crash. There could have been an injured party from the crash that had gone to the house maybe that needed help that couldn't call 911. " According to Captain Walsh, he made the decision to enter the residence based upon the "totality of the circumstances with the crashed car, front door standing open, the next-door neighbor who's watching the house telling me that the front door earlier had been locked."

Captain Walsh explained that, while the front door was open, to go inside the residence required him to open a closed, "screen door[.]" Captain Walsh said that he "called out Brentwood Police Department a number of times[,]" and receiving no response, both he and the neighbor entered the lower level of the residence. Captain Walsh continued to call out but found no one on the first level of the home. He then decided to go upstairs, but because it was dark upstairs, he went alone. Captain Walsh noticed a pair of tennis shoes with mud on them at the top of the stairs and a pair of shorts "at the top near the landing." He explained that these items were haphazardly strewn about. Once at the top of the stairs, there was a door immediately to Captain Walsh's right. He knocked on the door, announcing himself and again receiving no reply, opened the door.

Captain Walsh noticed "a gentleman in the bed who was partially covered who was asleep[,]" later identified as the Defendant. He "shined [his] light" and "yelled out commands" to the Defendant but never got a response. As he was approaching the Defendant, he observed mud on the Defendant's legs and "some scrapes[ and] scratches" on his arms. Captain Walsh vigorously tried to awaken the Defendant, but he was unsuccessful. Captain Walsh smelled alcohol on the Defendant's person and stated that he believed the Defendant was intoxicated. Concerned that the Defendant was injured, Captain Walsh called for emergency medical services (EMS) to treat the Defendant.

Upon their arrival, EMS personnel were able to arouse the Defendant. "They put him on a backboard and then took him out to the ambulance outside." Captain Walsh, who was just outside the ambulance door, overheard the Defendant make statements to the firefighters and paramedics who were treating him—the Defendant admitted that he had consumed alcohol and said that "he was DUI, not injured." The Defendant was taken to the hospital, where a blood alcohol test was performed.

On cross-examination, Captain Walsh acknowledged that he did not know exactly what time the car accident had occurred, that he did not notice any blood at the scene, and that he did not observe any alcoholic beverages inside the car. Captain Walsh clarified that, when he said "screen door" on direct examination, he was actually referring to "a full glass panel security door[.]" He further testified that, in addition to knocking on the front door of the home and likely ringing the door bell, he also knocked on the glass of "the back window" during his walk around the perimeter of the residence in effort to get someone's attention. Captain Walsh was asked if he inquired of Mr. Walker about possible occupants inside the house, and Captain Walsh recalled that Mr. Walker "mentioned that there was a son and that he thought he drove a green Altima."

When asked why he did not consider obtaining a search warrant prior to going inside the residence, Captain Walsh testified,

> Well, I don't know how long it's been since you've obtained a search warrant, but at 3:00 o'clock in the morning it would take a significant amount of time to do something like that. If there were someone inside the house that was in distress, you know, that could have resulted in them having permanent injury or even death while I was attempting to get a search warrant.

Captain Walsh acknowledged that, when he observed the Defendant in his bed, there were no outward signs of a major injury.

Mr. Walker, the next-door neighbor, testified that he encountered Captain Walsh outside the Defendant's residence in the early morning hours of July 11, 2009. He spoke with Captain Walsh, who alerted him that the front door to the residence was open. Mr. Walker stated that the door was locked when he left earlier in the evening and that he became "concerned about what possibly could have happened because [he] thought everyone was still out of town." He did not believe anyone was staying at the home. According to Mr. Walker, his responsibility was simply "[j]ust to watch the dog" while his neighbors were gone; he "had a garage door opener" to come and go; and he "made entry into the home through the garage."

-4-

On cross-examination, Mr. Walker expounded on his duties—"The only thing I was suppose to do was take the dog out twice a day and make sure it had food. And I'd take it out of it's kennel and I would take it out on a walk, and then I'd put it back at night." He did not have a key to the house, just the garage door opener, and the dog's food was in the garage. He also said that he did not "have permission to just hang out in the house" and that his authority was limited to "[j]ust going in twice a day to take care of the dog[.]"

Mr. Walker described that the main front door "was not like swung all the way open, but it was open enough where [he] noticed that [he] hadn't done it. [He] hadn't touched the door since [he] was watching the dog." He estimated that the door was "about two feet open" and claimed that it was not open "to the point where you could actually . . . see inside the house." When asked if he knew the Defendant was going to be staying at the home while his parents were out of town, Mr. Walker said, "She might have mentioned something, but I could have forgot or I didn't know he was going to be there at all. I just took the fact that he was going to be in Florida with them on vacation." According to Mr. Walker, this was only "the third or fourth day" the family had been gone.

The Defendant's step-father, William Ian McGruder, also testified. He clarified that he was not on vacation with his wife but "was traveling out of town" on July 11, 2009. He did not personally have any conversations with Mr. Walker about caring for the house. Mr. McGruder said that a "very heavy" storm door, which automatically closed, was installed at his house on the evening in question.

Following the hearing, the Defendant submitted supplemental authority to the trial court, arguing that the search was not based upon valid consent by a person with common authority over premises. Thereafter, the trial court denied the motion, reasoning as follows:

> After a careful review of the facts and a full consideration of the applicable law, the [c]ourt finds that Captain Walsh's presence in the Defendant's home was lawful on both consent and exigent circumstances bas[e]s.

> The record supports that the Defendant's neighbor, Martin Walker, had been given authority to enter the Defendant's home while the Defendant's parents were out of town. Mr. Walker had the apparent authority to consent to Captain Walsh's search of the residence.

> Additionally, and with more strength of argument, Captain Walsh was legally inside the Defendant's residence based upon exigent circumstance[s]. Relying on the information he had at the time he entered the residence, Captain

Walsh had probable cause to believe that the Defendant was inside the house, injured and in need of medical assistance. Additionally, Mr. Walker had told Captain Walsh that the homeowners were out of town. Mr. Walker informed Captain Walsh there was a son but he was unaware if he was there or not. He told Captain Walsh that he thought everyone was out of town and he did not think anybody was staying at the residence. Mr. Walker was concerned because the front door to the residence was open.

The totality of the circumstances as known to Captain Walsh at the time he entered the Defendant's residence created an urgent need for immediate action thus eliminating the timely procedure of securing a search warrant.

The Defendant subsequently entered into a negotiated guilty plea, pleading guilty to one count of DUI, first offense, and the remaining charges were dismissed. In exchange for his plea, he received a sentence of eleven months and twenty-nine days, suspended after serving seven days in jail. The Defendant also, pursuant to Tennessee Rule of Criminal Procedure 37(b)(2), reserved the following certified question of law for our review as a condition of his plea agreement:

Whether the entry and subsequent search of Defendant's home by the Brentwood Police Department on or about July 11, 2009, violated the Defendant's rights granted pursuant to the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution and [a]rticle I, [s]ections 7, 8 and 9 of the Tennessee Constitution and whether any evidence, statements and blood tests obtained as a result of said search should be suppressed as the fruits of an unconstitutional search, due to the fact there was no valid consent to search the home and there were no exigent circumstances present to otherwise justify the entry and search.

This case is now before us for our review. We are inclined to note that this is not the Defendant's first attempt to certify his question to this court. See State v. Justin Gibson, No. M2010-02361-CCA-R3-CD, 2011 WL 6916409 (Tenn. Crim. App. Dec. 28, 2011), perm. app. denied, (Tenn. May 22, 2012). In the first appeal, a panel of this court dismissed the Defendant's appeal for lack of jurisdiction because the order stating the certified question was not filed until after the Defendant filed his notice of appeal document, thus, failing to comply with the requirements of Tennessee Rule of Criminal Procedure 37(b)(2). Id. at *1, 3. Following our supreme court's denial of the Defendant's permission to appeal, the Defendant returned to the trial court and, on July 18, 2012, filed a motion to correct the judgment pursuant to Rule 36 of the Tennessee Rules of Criminal Procedure to include the order certifying the question of law. See Tenn. R. Crim. P. 36. ("After giving any notice it

considers appropriate, the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission. Upon filing of the corrected judgment or order, the defendant or the state may initiate an appeal as of right pursuant to Rule 3, Tennessee Rules of Appellate Procedure.") (as effective July 1, 2012). Although it appears that several hearings were held on this motion and those transcripts are not included in the record on appeal, the trial court granted this motion, entering amended judgments on October 2, 2012, complying with the procedural requirements for reserving a certified question of law.

Although we can find no case where this exact procedure has been permitted, there are several cases from our supreme court implying that this practice is acceptable.[2] See Cantrell v. Easterling, 346 S.W.3d 445, 449 (Tenn. 2011) ("While this Court has referred to Rule 36 in the context of trial courts attempting to amend judgments so as to preserve a certified question, this Court has not relied on Rule 36 in the context of a defendant's claim that his sentence is illegal.") (citations omitted); State v. Armstrong, 126 S.W.3d 908, 912 (Tenn. 2003) ("One prior decision does reflect, however, that a trial court is not without the means or the authority by which to take corrective action when it appears that a final judgment or order does not comply with the Preston requirements. As we pointed out in Pendergrass, 'the trial court retains limited power to correct clerical mistakes in judgments and other errors in the record arising from oversight or omission.'" (quoting State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) (citing Tenn. R. Crim. P. 36)) (footnote omitted); Pendergrass, 937 S.W.2d at 837-38. Based upon this line of cases from our supreme court, and given that neither party has challenged this procedure on appeal, we are inclined to review the question as properly certified.

## ANALYSIS

On appeal, the Defendant argues that the Captain Walsh's warrantless entry into his home was not justified by either consent or exigent circumstances and that the resulting evidence, the Defendant's statements to EMS personnel and subsequent blood alcohol test, should have been suppressed. The State responds that the trial court properly denied the motion to suppress because the warrantless search was justified under the exigent circumstances exception to the warrant requirement.[3] The State asserts that Captain Walsh

---

[2] These cases were prior to the recent amendment to Rule 36 and cite to the rule in effect at that time. The substance of the rule is unaltered by the recent amendment. The amendment differs only in that it now provides for notice to the parties and makes provisions for an appeal as of right.

[3] The State does not argue on appeal that the search was based upon proper consent, failing to include the issue in its appellate brief and conceding as much at oral argument. A third party's consent to search is valid

(continued...)

would have been derelict in his duty if he had not gone inside the Defendant's home to investigate further.

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). A trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures by government agents. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn.1998) (quoting Camara v. Mun. Ct., 387 U.S. 523, 528 (1967)). The general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression. State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012); see also State v. Garcia, 123 S.W.3d 335, 343 (Tenn. 2003). That is, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the

_____

[3](...continued)

where the third party had "common authority over [the] premises or effects . . . against the absent, non-consenting person with whom that authority is shared." State v. Bartram, 925 S.W.2d 227, 230-31 (Tenn. 1996) (citing U.S. v. Matlock, 415 U.S. 164, 171 (1974)). We agree with the Defendant and the State's concession that Captain Walsh's entry was not lawful based upon consent by a third party with common authority over the premises. Mr. Walker, a next-door neighbor, was only authorized to enter the home through the garage in order to provide care for the family dog; he did not have "joint access or control for most purposes" over the premises and, therefore, could not consent to a search of the Defendant's home. See id. at 231 (quoting Matlock, 415 U.S. at 171, n.7); see, e.g., State v. Huntingdon, 944 N.E.2d 240, 244-45 (Ohio Ct. App. 2010) (defendant's friend, whom defendant had asked to feed her cats for three days while defendant was out of town, lacked common authority over defendant's home, as required for friend to validly give police voluntary consent to enter without a warrant to search for drugs). Accordingly, we will only address the exigent circumstances exception in the remainder of this opinion.

State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). "If the circumstances of a challenged search and seizure come within one of the recognized exceptions, the fruits of that search and seizure are not subject to operation of the exclusionary rule and may be properly admitted into evidence." State v. Shaw, 603 S.W.2d 741, 743 (Tenn. Crim. App. 1980).

*I. Exigent Circumstances*

The issue before this court is whether Captain Walsh was justified in making entry into the Defendant's residence without first obtaining a search warrant. The United States Supreme Court has held that a warrant is not required to enter a person's home when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless [entry] is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94 (1978) (internal quotation marks omitted). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Under this "emergency aid" exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. Officers do not need "ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception[.]" Michigan v. Fisher, 558 U.S. 45, 49 (2009) (internal quotation marks omitted). Consistent with the Fourth Amendment's "ultimate touchstone" of reasonableness, officers must have an "objectively reasonable basis for believing" that "a person within the house is in need of immediate aid." Id. at 47 (internal quotation marks and brackets omitted).

"Brigham City illustrates the application of this standard." Id. There, four officers responded, at 3 o'clock in the morning, to a call about a loud party at a residence. Brigham City, 547 U.S. at 406. When they arrived, they heard "an altercation occurring, some kind of fight" inside the residence. They heard "thumping and crashing" and people yelling "stop, stop" and "get off me." According to one officer, "it was loud and . . . tumultuous." The noise came from the back of the house, so the officers went to the backyard to investigate. They saw two juveniles drinking beer and—through a screen door and windows—a fight underway in the kitchen. Four adults were attempting to restrain a juvenile who had broken free and punched one of the adults in the mouth. The adults pinned the juvenile against a refrigerator with such force that the refrigerator began to move along the floor. At that point, an officer opened the screen door, but did not enter, and announced his presence. When no one responded, the officer entered the kitchen and again shouted out. The fight eventually ceased when the individuals became aware that police had arrived. The Court held that the officers "had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning," permitting them to enter

the home to quell the violence.  Id.

In another "straightforward" application of the emergency aid exception, the Court in Fisher deemed reasonable an officer's warrantless home entry.  558 U.S. 45.  In that case, officers responded to a report that a man was "going crazy" inside a residence.  Id. at 45-46. The home was in "considerable chaos" when officers arrived—"a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside."  Wet blood was on the hood of the truck, the clothes inside it, and the home's front door.  Through a house window, officers observed the defendant with a fresh cut on his hand, screaming and throwing things. The back door was locked, and a couch blocked the front door.  The officers knocked, but the defendant refused to answer.  When officers asked the defendant through an open window if he needed medical assistance, he cursed at them and demanded that they get a warrant.  At that point, an officer pushed open the front door and entered the home.  The entry was lawful, the Court held, because the officers could reasonably believe that the items being thrown "might have a human target (perhaps a spouse or a child)," or that the defendant "would hurt himself in the course of his rage."  Id. at 48.

One case from the our supreme court fits within this category.  In State v. Meeks, 262 S.W.3d 710 (Tenn. 2008), the Tennessee Supreme Court discussed the exigent circumstances exception to the warrant requirement, explaining as follows:

> Exigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant.  Thus, in assessing the constitutionality of a warrantless search, the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant.  The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry.  Mere speculation is inadequate; rather, the State must rely upon specific and articulable facts and the reasonable inferences drawn from them.  The circumstances are viewed from an objective perspective; the governmental actor's subjective intent is irrelevant.  The manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone.  Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm.

Id. at 723-24.

In Meeks, a motel patron called the police to report a strong odor. Id. at 714-16. The caller also complained about burning eyes and headaches. An officer went to the motel, met with the caller, and recognized the "unmistakable" smell of a methamphetamine laboratory coming from the room next door. When backup officers arrived, the officers went to the suspect room. They heard voices in the room and knocked on the door, but no one answered. The officers decided to enter the room due to the "dangers posed by manufacturing methamphetamine" and obtained a key from the manager. However, when they tried to open the door, the door would not open completely due to a chain lock, and a large cloud of fumes escaped through the partially opened door. The officers decided to kick open the door. Inside, they found the two defendants, one of whom was unconscious, and an active methamphetamine laboratory. The defendants were removed from the scene, and the officers obtained a search warrant based upon the information they had obtained from their warrantless entry into the room. During the subsequent search, the officers found methamphetamine and various parts of a methamphetamine laboratory. The defendants were indicted for manufacturing methamphetamine, possessing methamphetamine, and possessing drug paraphernalia. They filed a motion to suppress, arguing that the warrantless entry was not justified by exigent circumstances, and the trial court granted the motion. However, this court reversed the trial court, holding that the defendants' actions had presented an immediate threat to public safety.

On appeal to our supreme court, the supreme court described methamphetamine laboratories as "highly dangerous," noting that

> [i]n addition to being highly combustible, the vapors or fumes that are generated in the production of methamphetamine pose further dangers. For example, exposure to the toxic fumes or vapors produced during the manufacture of methamphetamine, some of which are carcinogenic, can cause serious inhalation injuries to those at the laboratory site and sometimes even to neighbors.

262 S.W.3d at 725. The court also noted that some jurisdictions have adopted a per se rule that the discovery of an active methamphetamine laboratory creates an exigent circumstance that does not require a search warrant while other jurisdictions have determined that the exigency is based on whether the location of the laboratory creates a danger to others such as neighbors, law enforcement officials, and the individuals manufacturing the methamphetamine. Id. at 725-26. Regardless, "the scope of a permissible warrantless search remains limited to the scope of the exigency." Id. at 726. According to our supreme court, the facts in Meeks clearly supported the existence of exigent circumstances and "provided

-11-

the officers with an objectively reasonable basis for concluding that there was an immediate need to act to protect themselves and others from serious harm." Id. at 726-27.

Now, we must determine if the present case comes under this line of jurisprudence. We find one district court's analysis on the issue both particularly instructional and helpful. See United States v. Brandwein, No. 11-4015-01/02-CR-C-NKL, 2012 WL 7827660 (W.D. Mo. May 24, 2012). The district court in Brandwein made the following observations:

> It is worth noting that all cases where a court has found that an exigent circumstance existed appear to share two common factors. First, in all of the cases in which courts found exigency, officers observed events obviously occurring within the residence or building. For example, cries for help, screams, loud noises, or an observation of a struggle or fight within the structure by looking through a window. Second, courts have found exigent circumstances exist when officers observed events or evidence leading directly to a structure. For example, a blood trail leading to a closed door. See, e.g., [Fisher, 558 at 45-48] (exigent circumstances justified warrantless entry of house when officers saw recently injured person and heard violent noises coming from inside; because officer heard screams coming from the house and had been told by 911 operator that violence might be occurring); United States v. Klump, 536 F.3d 113, 118 (2nd Cir. 2008) (search of warehouse justified because police were investigating "odor of something burning" and developed a reasonable belief that a fire was burning inside a building); United States v. Lenoir, 318 F.3d. 725, 730 (7th Cir. 2003) (home entry justified where officers observed a drunk man wielding a shotgun and assault rifle retreat into a home). In these cases, the situation the officers encountered necessitated immediate or near-immediate action. See, e.g., Michigan v. Tyler, 436 U.S. 499, 509 (1978) ("[I]t would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze.").

2012 WL 7827660, at *7.

In the case sub judice, while there was a series of suspicious circumstances occurring at or near the Defendant's residence on the evening in question, the factors common in these other exigent circumstances cases were not present. There were no signs or sounds of distress coming from inside the home nor evidence leading directly to the structure.

The trial court found Captain Walsh's testimony that he entered the home out of concern that someone inside may have been seriously injured and in need of assistance due to the car accident that occurred close by to be credible. The trial court further noted that Mr.

Walker told Captain Walsh that the residents were out of town but that Captain Walsh was concerned because the front door was open, insinuating that a break-in was possible. Here, Captain Walsh was aware of the following information before entering the Defendant's home: (1) A car, registered to this address, had apparently hit a tree about one-half of a mile away, and the airbags had deployed; (2) When he arrived at the residence at approximately 3:00 a.m., the front door to the residence was "standing open[,]" but the glass, security door was closed; (3) No one responded to his presence when he announced himself and knocked at both the front and the back of the residence; and (4) Mr. Walker, who was caring for the residents' dog, informed Captain Walker that he believed all of the residents were out of town and that the door was not ajar when he was at the residence several hours earlier that day.

Under these circumstances, we respectfully disagree with the trial court's ruling that exigent circumstances justified Captain Walsh's entry based upon his belief that someone inside of the home may have been seriously injured or a possible burglary might have occurred. The aforementioned cases which approve the warrantless entry into a home to render emergency aid and assistance are, without exception, based upon the officers' observations of the place to be searched. These observations readily led to a conclusion that a person had been or was about to be harmed, thereby requiring immediate action. Such is not the case here as there was no evidence leading directly into the home, such as a trail of blood, and there were no noises, voices or screams leading officers to believe someone inside may be in immediate distress or in need of protection. Here, nothing at the accident scene caused Captain Walsh to believe that the driver was seriously injured. By the time Captain Walsh arrived at the residence, the Defendant had already managed to walk back to his house and fall asleep in his bedroom upstairs. Captain Walsh did not see or hear anything to cause one to think that someone was in the home, much less that someone was in need of immediate assistance. Although testifying as to his belief about a possible break-in, Captain Walsh allowed the neighbor to accompany him inside the residence. Captain Walsh not only entered the first floor of the residence but proceeded all the way inside to an upstairs second-floor bedroom with the door closed before encountering the Defendant. We conclude that warrantless search in this case was not appropriate based upon exigent circumstances. See Fern Lynn Kletter, J.D., Annotation, Necessity of Rendering Medical Assistance as Circumstance Permitting Warantless Entry or Search of Building, 58 A.L.R.5th 499 (2003) (citing cases where courts held that warrantless entry into a building to purportedly render assistance to a motor vehicle accident victim was not justifiable under the emergency exception and further commenting that the United States Supreme Court in Bonvicino v. Hopkins, 559 U.S. 1048 (2010), declined to grant certiorari from Hopkins v. Bonvicino, 573 F.3d 752 (9th Cir. 2009), in which the Ninth Circuit held that neither the emergency nor the exigent circumstances exception to the Fourth Amendment's warrant requirement justified police officers' warrantless entry into the home of the suspected driver in a "hit and run"

accident). See also People v. Krueger, 567 N.E.2d 717 (Ill. App. Ct. 1991) (police did not have reasonable grounds to believe that the motorist required their immediate assistance to safeguard his well-being; the police knew only that the motorist had returned home from the accident, was upstairs sleeping and, according to a neighbor, was "out of it" but "fine"); Com. v. DiGeronimo, 652 N.E.2d 148 (Mass. App. Ct. 1995) (warrantless entry into the residence of an allegedly drunk driver who had just been involved in an accident with another vehicle and then drove home was not justified by the emergency doctrine, where the driver of the other vehicle was not injured and did not tell police that the drunk driver was injured, but only that he appeared drunk); Lambert v. State, 745 P.2d 1185 (Okla. Crim. App. 1987) (no exigent circumstances justified warrantless entry into the occupant's house, notwithstanding a patrolman's concern for the occupant's possible physical injuries stemming from a severe car crash); State v. Bramson, 765 P.2d 824 (Or. Ct. App. 1988) (warrantless entry, culminating in the seizure of marijuana, was held not justified under either emergency/exigent circumstances exception or the emergency aid doctrine, where the occupants' front door was open, the screen door had no glass or screen, the weather was cold, a vehicle was in the driveway, the occupants were reportedly out of town, and there was no report or other indication of unauthorized entry or criminal activity.)

## II. "Community Caretaker" Function

Courts in other jurisdictions have also addressed actions similar to Captain Walsh's as part of a police officer's "community caretaking" function. See United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir.); Brandwein, 2012 WL 7827660, at *9; see also 3 Wayne R. LaFave, Search and Seizure, §§ 6.6 n.4, 6.6(a) n.7 (5th ed.) (citing cases). Particularly relevant to this issue is our supreme court's recent opinion in State v. Moats, 403 S.W.3d 170 (Tenn. 2013). In that case, an Etowah Police Department officer observed the defendant sitting in a parked car in the parking lot of a grocery store at 2:00 a.m. Id. at 175. Upon observing the truck in the same location five minutes later, the officer parked "behind the truck, activated her blue lights, and called in the license plate number." During a brief conversation with the defendant, the officer observed an open beer in the cup holder and noticed that the defendant "appeared to be 'disoriented, very slow to speak, very sleepy acting.'" The defendant eventually failed field sobriety tests and was placed under arrest for DUI. On appeal, our supreme court reversed the defendant's conviction, concluding that "the circumstances here demonstrate that the officer was not acting within a community caretaking role and did not have reasonable suspicion or probable cause to seize" the defendant. Id. at 188.

Pertinent to this case, the court in Moats concluded that the community caretaking doctrine applied only to consensual police-citizen encounters, was not an exception to the warrant requirement and, thus, did not justify the warrantless seizure in that case. Id. In the face of a vigorous dissent, the majority noted the following:

-14-

We are aware that the doctrine of community caretaking, as interpreted and applied in our state—i.e., as a type of third-tier consensual police-citizen encounter—represents a minority rule among other jurisdictions. Indeed, as the dissent points out, the vast majority of courts have applied the community caretaking doctrine as "an exception" to the warrant requirement of the Fourth Amendment to the United States Constitution. E.g., United States v. Coccia, 446 F.3d 233, 237-38 (1st Cir. 2006); United States v. Pichany, 687 F.2d 204, 205 (7th Cir. 1982); People v. Luedemann, 857 N.E.2d 187, 198-99 (2006); State v. Graham, 175 P.3d 885, 890 (2007); Ullom v. Miller, 705 S.E.2d 111, 120 (2010). As noted in this opinion, however, this Court has for decades interpreted article I, section 7 of the Tennessee Constitution as imposing stronger protections than those of the federal constitution, which, under stare decisis, we are not prepared to dismissively brush aside.[4] Particularly in the area of search and seizure law, we have often rejected the standards adopted by the United States Supreme Court in favor of more protective doctrines, tests, and rules. See, e.g., State v. Carter, 16 S.W.3d 762, 768 n.8 (Tenn. 2000) (noting that Tennessee has never recognized the "good faith" exception to the exclusionary rule that was adopted by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984)); State v. Jacumin, 778 S.W.2d 430, 435-36 (Tenn. 1989) (refusing to adopt the test for probable cause as established by the Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983), because it is "inadequate"); State v. Lakin, 588 S.W.2d 544, 549 n.2 (Tenn. 1979) ("Where, . . . as in the particular phase of search and seizure law under consideration, there has been a settled development of state constitutional law which does not contravene the federal, we are not inclined to overrule earlier decisions unless they are demonstrably erroneous.").

While we recognize the rationale underlying the majority rule, we see no reason to depart from the standards of community caretaking that have developed in our state, particularly because neither party has articulated a persuasive basis for recognizing this as yet another exception to the constitutional protections against unreasonable searches and seizures. See Lakin, 588 S.W.2d at 549 (recognizing that, in the context of the "open fields"

---

[4] We feel compelled to note that our supreme court has also made statements such as, "[a]rticle I, [section] 7 [of the Tennessee Constitution] is identical in intent and purpose with the Fourth Amendment [of the United States Constitution]," and that federal cases applying the Fourth Amendment should be regarded as "particularly persuasive." Sneed v. State, 423 S.W.2d 857, 860 (Tenn. 1968); see also State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006) (citations omitted); State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (citation omitted).

-15-

doctrine, "[a]lthough the decisions in this state may be somewhat more restrictive than those in other states or than federal decisions, no compelling reason has been demonstrated in this case for modifying or overruling them"). The Defendant has argued strongly against treating community caretaking as an exception to the warrant requirement, and the State has simply asserted that "the touchstone of this fact-intensive analysis is reasonableness." Unlike the dissent, we decline to adopt an approach to community caretaking that would diminish "the most basic constitutional rule" that warrantless searches and seizures are per se unreasonable, simply because it has been adopted by a majority of other courts.

403 S.W.3d at 187-88 n.8 (footnote added). As further noted by our supreme court in Moats, the community caretaking role has also been used to justify the "emergency aid doctrine"; however, the court "decline[d] to address the myriad [of] circumstances under which the community caretaking function might apply in our State." Id. at 186-87 n.7 (emphasis added) (citation omitted).

The decision in Moats is reminiscent of other jurisdictions which have limited Cady v. Dombrowski to vehicles, although our supreme court did not out-right make such a statement. Those courts have held that because the Court in Dombrowski stressed the "distinction between motor vehicles and dwelling places," its application is to be limited to searches of vehicles. See, e.g., Ray v. Township of Warren, 626 F.3d 170, 177 (3rd. Cir 2010); United States v. Bute, 43 F.3d 531, 535 (10th Cir. 1994); United States v. Erickson, 991 F.2d 529, 531 (9th Cir. 1993); United States v. Pichany, 687 F.2d 204, 208-09 (7th Cir.1982). The Moats court did state,

Our extensive research suggests that community caretaking can generally be classified into several categories, all of which are separate and distinct from traditional criminal investigation or detection. The primary form of community caretaking . . . is also known as the public safety function and is the type of community caretaking originally identified by the United States Supreme Court. In Dombrowski, the Court observed that

[b]ecause of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.

413 U.S. at 441. Like the community caretaking standards that have developed in our state, this type of community caretaking described by the Supreme Court "supports relatively minor or regular interactions with the police: approaching parked cars when the driver appears incapacitated or sick or the car is functioning improperly and approaching pedestrians who appear lost, in danger, or ill." The core of any community caretaking function is when the police act to protect or assist the public in some manner outside of "the crime-control paradigm."

403 S.W.3d at 186-87 (footnotes and some internal citations omitted).

Because our supreme court declined to recognize the community caretaking doctrine as an exception to the Fourth Amendment's warrant and probable cause requirements, and limited the doctrine to consensual police-citizen encounters, we cannot conclude that Captain Walsh was validly acting a community caretaker role when he entered the Defendant's residence. Nothing about Captain Walsh's encounter with the Defendant can be deemed a consensual police-citizen encounter. The court in Moats was clear that a more restrictive approach was necessary in this State. In accordance with this recent precedent, we conclude that Captain Walsh's entry into to the Defendant's home was not authorized under any exception to the warrant requirement, and therefore, the Defendant's motion to suppress was improperly denied.

## CONCLUSION

In summary, we conclude that the trial court erred by denying the Defendant's motion to suppress. Accordingly, the judgment of the trial court is reversed. Because the nature of this appeal requires that the issue is dispositive of the case and because we agree that it is, the charge against the Defendant is dismissed.

_____
D. KELLY THOMAS, JR., JUDGE